IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2009 Session

# WATER AUTHORITY OF DICKSON COUNTY v. CHARLES B. HOOPER, GENE C. HOOPER, AND DICKSON COUNTY, TENNESSEE

Appeal from the Circuit Court for Dickson County
No. CV-1594    Larry J. Wallace, Judge

No. M2009-01548-COA-R3-CV - Filed April 28, 2010

This is a condemnation case in which the Water Authority of Dickson County acquired an easement by eminent domain for the purpose of installing a subsurface water transmission line. The Water Authority's ability to take the land is not in question; this appeal only involves the amount of compensation to which the landowners are entitled. Following a trial without a jury, the court awarded $12,526.56 for the taking of the permanent easement and incidental damages. The Water Authority appeals. Finding error, we vacate the judgment of the court and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY and FRANK G. CLEMENT, JR., JJ., joined.

Benjamin C. Regen, Dickson, Tennessee, on behalf of appellant, Water Authority of Dickson County.

Henry F. Todd, Jr., Dickson, Tennessee, on behalf of appellees, Charles B. Hooper, Gene C. Hooper, and Dickson County, Tennessee.

## OPINION

### I. Background

The Water Authority of Dickson County (the "Authority") acquired by eminent domain a twenty-foot wide permanent easement on March 5, 2002, for the purpose of constructing a subsurface, 24 inch transmission waterline across a portion of two tracts of

real property.  One tract is owned by Gene Hooper and his brother, Charles Hooper, and consists of 86.27 acres of undeveloped land used to make hay at the time of the condemnation.  This tract has frontage along three roads – the southern boundary line follows Hooper Road for the entire length of the property, the western boundary follows Liberty Road and a small portion of the northern boundary, approximately 250-300 feet, follows State Route 47.  The other smaller tract, consisting of 26.5 acres of undeveloped land, is owned by Gene Hooper and his wife, Vera Hooper.[1]  This smaller tract is located near the larger tract with its eastern boundary line following Liberty Road across from the larger tract; the entire length of the tract's northern boundary follows Shelton Road while its entire western boundary follows Cleve Road.  The Authority's ability to condemn the properties was not challenged; however, the property owners challenged as unreasonable the amount the Authority deposited with the trial court, $3,579.00, for the taking.  This appeal concerns the larger tract.

A trial was held on the issue of damages wherein testimony was given as to the estimated value of the property, the value of the easement and the available uses to which the property could be put both before and after the taking.  Gene Hooper, one of the landowners and an executive in banking and financial services for  52 years, testified that he estimated the value of the larger tract at the time of the taking in 2002 to be approximately $15,000 per acre.  With respect to the smaller tract, he testified that he thought it was slightly more valuable than the larger tract such that he estimated its value at no less than $15,000 per acre.

Charles Hooper, who jointly owns the larger tract, testified that he is the former chief of real estate for the Nashville district of the U.S. Army Corps of Engineers and that he estimated the value of the larger tract at the time of the taking to be around $15,000 per acre; he did not opine as to the value of the smaller tract.  Charles Hooper explained that his opinion was based in large part on sales of nearby lots in 2002 that averaged $15,000 per lot as well as his experience selling a six-acre piece of property he owned in the area for around $6,000 per acre despite having significantly less frontage to a road than the properties at issue.

The landowners retained an expert witness, Bob Gerdeman, to opine on the value of the easements taken; he suggested two different methods for the Court to utilize in

---

[1]    The Authority sought condemnation of the easement across the two properties by separate petitions; however, because Gene Hooper is a common owner of both parcels, the two cases were given sequential docket numbers and the trial court held a single trial to determine compensation owed by the Authority to both sets of owners.  The arguments before this Court were similarly heard together; however, the opinion in the companion case, Water Authority of Dickson County v. Gene C. Hooper and Vera S. Hooper, proceeds separately under case number M2009-01342-COA-R3-CV.

determining the value of the easements. The first method compared the prices paid for recorded easements in Dickson County in the late 1990s and early 2000s. Mr. Gerdeman chose several recorded easements at random and found that the range for 100-foot wide easements purchased by the Tennessee Valley Authority ranged from $15.00 to over $50.00 per running foot while 20-foot wide easements purchased by BellSouth were between $3.00 and $3.45 per running foot. Mr. Gerdeman testified that he based his testimony solely on the information contained in the recorded easements; he did not visit the comparison easements nor did he visit and inspect the properties at issue. The second method involved comparing sales of tracts of land similar in size to the easements taken in this case, which was approximately 1.6 acres on the larger tract and .84 acres on the smaller tract. Mr. Gerdeman examined sales of one and two-acre tracts within a 5 or 6-mile radius of the property and found that the sales price ranged from $15,000 to $22,800 per acre.

The Authority also retained an expert witness, Chris Chatham, to provide an appraisal of the property and opine as to the appropriate compensation owed the landowners. Mr. Chatham testified that he inspected the property and estimated the value of the larger tract at $3,250.00 per acre for a total value of $292,175.00 based on comparable sales of similar sized properties. He estimated the value of the smaller tract at $6,500 per acre for a total value of $166,465. Mr. Chatham determined, however, that in his opinion the landowners were only entitled to nominal damages, approximately $1.00 per foot, because "there was [sic] no damages" to the property as a result of the easement.

With respect to possible uses of each of the properties at the time of the taking, Gene Hooper testified that both properties were currently used to make hay, but that it was possible to develop the land for residential use since there were electric, gas, water and sewer lines available to the property. Mr. Chatham testified that, based on his inspection of the properties, the use of the properties at the time of the taking was agricultural and that this was also the highest and best use of the properties. Mr. Chatham admitted on cross-examination, however, that the highest and best use of the properties would be to sub-divide and develop them for residential use. Mr. Chatham also admitted that 30 percent of the surrounding area was used for single family residences while the remaining 70 percent was vacant.

The Authority also called Judy Alford, an environmental engineer involved in the design and construction of the water transmission line, to testify. Ms. Alford testified that the waterline was generally laid 30 inches below the surface of both tracts, but that the depth varied at certain points depending on the topography of the land. She testified that in planning the placement of the line, her team tried to keep the line close to roads to make it easily accessible for maintenance. Ms. Alford testified that the easement on the rectangularly shaped larger tract runs a total of 3,579 feet and generally follows the northern boundary of the property except for approximately 750 feet, when it then gradually diverges

southwesterwardly up to 200 feet toward the interior of the tract to avoid a pond; it then follows the western boundary line to its point of exit from the property. On the "L" shaped smaller tract, the easement enters the property at the boot portion of the "L" and follows what is the southern property line for 398 feet; the property line then turns in a southerly direction and proceeds along the eastern boundary of the property, while the easement continues west across the middle of the property for 672 feet until it reaches the western boundary line, where it makes a 90 degree turn and follows Cleve Road. Ms. Alford did not identify any topographical features on the smaller tract that influenced the placement of the easement and subsequent pipeline.

Ms. Alford also testified regarding the use of the land on top of the pipeline. She explained that no permanent structures should be constructed on top of the easement because the Authority would need access to the waterline for maintenance. For example, Ms. Alford did not recommend building a house or a barn over the easement. She explained that a concrete driveway could be placed on top of the easement, though she admitted that the concrete would have to be torn up and replaced to maintain the line. She further testified that the land on top of the line could be plowed to a depth of approximately 12 inches. Finally, she testified that the waterline was for transmission purposes only and offered no benefit to the property.

The trial court did not find that the taking was complete or absolute; however, the court found that the easement adversely affected the properties because of the reduction in available uses of the property within the easement. The trial court explained that, while the landowners could use the land "to some degree[,] . . . they cannot use it in every way possible." The trial court noted that the landowners would not want to build a house on top of the easement and, as a practical matter, would not want to build any kind of driveway that involved concrete or pavement; the court found, though, that a gravel driveway "possibly would not be a problem." The trial court also noted that the land within the easement could continued to be used for farmland, but cautioned against plowing the land where the pipe was laid for fear of tearing up a tractor or other implement. Consequently, the trial court found "it would be better if nothing is on it" so that the utility can readily access it for maintenance. The court concluded that, since it was not an absolute taking, the appropriate measure would be on a per running foot basis and determined that $3.50 per running foot would compensate the landowners for the loss of their property rights and incidental damages resulting in a total award of $12,526.50. The Authority appeals.

## II. Standard of Review

Because this case was tried without a jury, our review of the trial court's factual findings is *de novo* upon the record, accompanied by a presumption of correctness, unless the

preponderance of the evidence is otherwise. Tenn. R. Civ. P. 13(d). "'When the trial judge has seen and heard a witness's testimony, considerable deference must be accorded on review to the trial court's findings of credibility and the weight given to that testimony.'" *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 419 (Tenn. 2009) (quoting *Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d 164, 167 (Tenn. 2002)). Our review of a trial court's conclusions of law is *de novo* upon the record with no presumption of correctness. *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008); *Staples v. CBL Associates, Inc.,* 15 S.W.3d 83, 88 (Tenn. 2000).

## III. Discussion

The Tennessee Constitution provides "[t]hat no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor." Tenn. Const. Art. 1, § 21. The Legislature has directed that "[i]n estimating damages, the jury shall give *the value of the land or rights taken without deduction*, but incidental benefits which may result to the owner by reason of the proposed improvement may be taken into consideration in estimating the incidental damages." Tenn. Code Ann. § 29-16-114(a)(1) (emphasis added); *see also* Tenn. Code Ann. § 29-17-910. The objective of the court in an eminent domain proceeding, therefore, is to ascertain and award "just compensation" to the landowner, an amount consisting of the value of the land or rights taken and any incidental damages less any benefits resulting from any improvement. *Love v. Smith*, 566 S.W.2d 876, 878 (Tenn. 1978).

Generally, fair market value of the property or rights taken is the measure of damages. *Love*, 566 S.W.2d at 878; *Nashville Housing Authority v. Cohen*, 541 S.W.2d 947, 950 (Tenn. 1970); *Alloway v. Nashville*, 88 Tenn. 510, 13 S.W. 123 (1890). The fair market value of the land or rights taken is to be determined by the fact finder after considering all relevant facts affecting value as well as all the legitimate uses for which the property is available and reasonably adapted. *Love*, 566 S.W.2d at 878*; Cohen,* 541 S.W.2d at 950; *State of Tenn. ex rel. Dep't of Transp., Bureau of Hwys v. Brevard*, 545 S.W.2d 431 (citing *Alloway*, 13 S.W. 123; *Davidson County Board of Education v. First American Bank*, 202 Tenn. 9, 301 S.W.2d 905, 907 (1957)). When less than a fee simple is taken, such as the case here, the fair market value of the rights taken is generally found by determining the difference in the fair market value of the entire property prior to the taking and its value after the taking. *Mills v. Solomon*, 43 S.W.3d 503, 508-09 (Tenn. Ct. App. 2000); *State ex rel. Shaw v. Gorman*, 596 S.W.2d 796, 797 (Tenn. 1980); *Betty v. Metropolitan Gov't*, 797 S.W.2d 1, 7 (Tenn. Ct. App. 1992).

In addition, if the taking has adversely impacted the remainder of the property, a court may also award incidental damages. *Shelby County v. Kingsway Greens of America, Inc.*,

706 S.W.2d 634, 638 (Tenn. Ct. App. 1985); *Colonial Pipeline Co. v. Eatherly*, 621 S.W.2d 770 (Tenn. Ct. App. 1981); 8 *Tenn. Prac. Pattern Jury Instr. - Civil* § 11.04 (2009). Incidental damages are measured by the difference in the remaining property's fair market value immediately before and immediately after the taking. *Kingsway Greens of America,* 706 S.W.2d at 638; *State ex rel. Shaw*, 596 S.W.2d at 797. Factors that may be considered in determining the incidental damages include the loss of use of the property for any lawful purpose, any unsightliness of the property or inconvenience in its use, any impairment to the owner's access to nearby streets and highways and any other consideration that could reduce the fair market value of the remaining property. 26 *Am. Jur. 2d Eminent Domain* § 284 (2010); 8 *Tenn. Prac. Pattern Jury Instr. - Civil* § 11.04 (2009). Any incidental damages resulting from a partial taking should be measured in relation to the entire tract of property. *Mills*, 43 S.W.3d at 509; *see Blevins v. Johnson County*, 746 S.W.2d 678 (Tenn. 1988); *State ex rel. Pack v. Walker*, 423 S.W.2d 473 (Tenn. 1968).

The landowner bears the burden of proof and of producing evidence as to the issue of compensation. *Catlett v. State*, 336 S.W.2d 8, 11 (Tenn. 1940); *Town of Erin v. Brooks*, 230 S.W.2d 397, 411 (Tenn. 1950); *Lebanon & Nashville Turnpike Co. v. Creveling, Comm'r, et al.*, 17 S.W.2d 22, 24 (Tenn. 1929).

The Authority raises two questions on appeal: (1) whether the trial court erred in admitting the testimony of Bob Gerdeman, the landowners' expert, which, the Authority contends, was both inadmissible and irrelevant and (2) whether the weight of the evidence fails to support the trial court's compensation award.

### A. Admissibility of Expert Testimony

Tennessee Rules of Evidence 702 and 703 govern the admissibility of expert testimony in Tennessee. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides in relevant part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the fact or data need not be admissible in evidence. . . . The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Accordingly, the trial court "must determine that the expert testimony is reliable in that the evidence will substantially assist the trier of fact to determine a fact in issue and that the underlying facts and data appear to be trustworthy." *Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005). In addition to these specific rules, evidence generally must be relevant to be admissible. *See* Tenn. R. Evid. 401, 402.

Questions pertaining to the admissibility of expert testimony are matters left to the trial court's discretion. *Brown*, 181 S.W.3d at 273; *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997). This is particularly true in condemnation cases where a trial court is allowed "wide discretion" when ruling on the admissibility of an expert's testimony as to the value of the land taken in condemnation cases "because the weight to be given each expert's testimony is for the trier of fact." *City of Murfreesboro v. Pierce Hardy Real estate, Inc.*, M2000-00562-COA-R9-CV, 2001 WL 1216992, at *2 (Tenn. Ct. App. Oct. 12, 2001) (citing *State ex rel. Dep't of Transp. v. Brevard*, 545 S.w.2d 431, 436 (Tenn. Ct. App. 1976). Since trial court's have such broad discretion over the admission of evidence, including expert testimony, concerning the value of condemned land, *see City of Johnson City v. Outdoor West, Inc.*, 947 S.W.2d 855, 858 (Tenn. Ct. App. 1996), we review the trial court's determination of the admissibility of an expert witness's testimony under an abuse of discretion standard. *City of Murfreesboro*, 2001 WL 1216992 at *2; *State Dep't of Transp. v. Veglio*, 786 S.W.2d 944, 947-48 (Tenn. Ct. App. 1989).

Under the abuse of discretion standard, "we may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." *Brown*, 181 S.W.3d at 273 (citing *McDaniel*, 955 S.W.32d at 263-64). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Id.*

The Authority first contends that the trial court abused its discretion by failing to strike the testimony of Mr. Gerdeman relating to the sales of other easements in Dickson County because, according to the Authority, it was inadmissible. Citing *Coate v. Memphis R. Terminal Co.*, 111 S.W.923, 924 (Tenn. 1908), the Authority insists that evidence as to what the same or other condemning authorities have paid for property in the area is, in essence, *per se* inadmissible in determining the compensation due a landowner following the taking of his or her property in an eminent domain proceeding.

*Coate* set forth the general rule that sales in which the purchaser is an instrumentality having the power of eminent domain are excluded when determining the value of the

property taken. *Coate*, 111 S.W.at 924. More recently, however, this Court rejected an argument similar to the one the Authority makes in this case. *State ex rel. Farris v. Upton*, No. 87-190-II, 1987 WL 18968, at *3-5 (Tenn. Ct. App. Oct. 30, 1987) (holding that sales of similar properties to other condemning authorities was admissible where it was established that the sales were free, voluntary, arms-length and not tainted by the threat of condemnation). In rejecting the application of *Coate* to the facts of that case, the *Farris* court discussed at length a recognized exception to the general rule of exclusion. *Id.* at *4-5 (citing 27 Am.Jur. 2d *Eminent Domain* § 430 (1966); J. Sackman, 5 *Nichols' on Eminent Domain* § 21.33 at 21-103 (3d ed. 1985); *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15 (5th Cir. 1969)); *see also United States v. An Easement and Right of Way over a Tract of Land in Madison County, Tenn.*, 405 F.2d 305, 307 (6th Cir. 1968)(held that a sale to a school board having the power to condemn is admissible). The court explained that where it can be shown that the sale of similar land was voluntary, the mere fact that one of the parties to the sale had the power to condemn does not of itself make the sale compulsory. *Id.* The court further explained:

> The party claiming the exception bears the burden of proving that the comparable sales are voluntary; that is, he must show that the sales in question were made willingly, without coercion, compulsion, or compromise. Sales to buyers possessing the power of eminent domain should be admitted as independent evidence of market value only when it is certain that those sales truly represent the market value of the land in question. That necessarily means that the party relying on the exception to the exclusion rule must show that the sales were uninfluenced by the buyer's possession of the eminent domain power.

*Id.* (citing *Transwestern Pipeline Co.*, 418 F.2d at 19).

Mr. Gerdeman relied on a recorded easement entered into between BellSouth Telecommunications and certain property owners as well as a recorded grant of a transmission line easement from Dickson County to the Tennessee Valley Authority. While BellSouth and the TVA enjoy the power of eminent domain, both instruments reflect consideration paid for the easements and there is nothing to indicate that the amounts paid for the easements were determined in a condemnation proceeding. While Mr. Gerdeman testified that he did not interview the parties to these sales, he stated that he believed, based

on his research, that the comparison easement sales were voluntary.[2]  Accordingly, we do not find that the trial court abused its discretion in admitting the evidence of comparison sales.

The Authority next contends that Mr. Gerdeman's entire testimony should have been excluded based on its lack of relevance.  Specifically, the Authority argues that Mr. Gerdeman failed to (1) offer an opinion of the value of the properties or subject easement, (2) explain how, other than the fact that the properties he used for comparison were in the same county as those at issue, the properties were comparable, and (3) testify as to the impact on either of the properties resulting from the easements.

"Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  In the context of a condemnation proceeding, evidence of other sales of comparable property is persuasive evidence of market value, and the admission of such sales for the purpose of determining value is largely within the discretion of the trial court.  *State ex rel. Farris v. Upton*, No. 87-190-II, 1987 WL 18968, at *2 (citing *Union Railway Co. v. Hunton*, 114 Tenn. 609, 624-25, 88 S.W. 182, 186 (1905)); *Memphis Hous. Auth. v. Newton*, 484 S.W.2d 896, 897 (Tenn. Ct. App. 1972);  *see United States v. An Easement and Right of Way over a Tract of Land in Madison County, Tenn.*, 405 F.2d at 307.  No general rule has been laid down, however, as to the degree of similarity or nearness with respect to time or distance. *Newton*, 484 S.W.2d 896, 897 (citing *Lewisburg & N.R. Co. v. Hinds*, 134 Tenn. 293, 183 S.W. 985 (1915); *Memphis Housing Authority v. Ryan*, 54 Tenn.App. 557, 393 S.W.2d 3 (1964)). *Memphis Hous. Auth. v. Newton*, 484 S.W.2d 896, 897 (Tenn. Ct. App. 1972).  Some factors the court may consider include the size and location of the properties, geographic features, timing of the sales, and all available uses to which the properties are adaptable.  *See e.g.*, *Ryan*, 393 S.W.2d at 13; *Maryville Hous. Auth. v. Ramsey*, 484 S.W.2d 73, 76 (Tenn. Ct. App. 1972); *Shelby County v. Mid-South Title Co.*, 615 S.W.2d 677, 680 (Tenn. Ct. App. 1980); *Memphis Hous. Auth. v. Mid-South Title Co.*, 443 S.W.2d 492, 499, 501 (Tenn. Ct. App. 1968); Sackman & Rohan, 5 *Nichols' The Law of Eminent Domain*, § 21.31 (Rev. 3d ed. 1991).  If the trial court determines the sales are sufficiently comparable, "the extent of comparability goes to the weight rather than to the admissibility of the evidence."  *Shelby County v. Mid-South Title Co., Inc.*, 615 S.W.2d 677, 680 (Tenn. Ct. App. 1980); *see United States v.*

---

[2]  While the evidence demonstrated that the sales were not the result of a condemnation proceeding, Mr. Gerdeman testified that he did not interview the parties to those transactions or otherwise research the circumstances and context of those sales; consequently, no evidence was presented affirmatively showing that the sales were not completed under the threat of condemnation.  Despite this failure the recorded instruments are evidence that the sales were voluntary; this was apparently sufficient for the trial court to admit Mr. Gerdeman's testimony and subject it to cross-examination.

*An Easement and Right of Way over a Tract of Land in Madison County, Tenn.*, 405 F.2d at 307 (citing *United States v. 124.84 Acres of Land, etc.*, 387 F.2d 912 (7th Cir. 1968).

Mr. Gerdeman testified that the sales of the easement he used for comparison were within Dickson County and that the small tract sales he used for comparison were within a five to six mile radius of the properties at issue. He also testified that the comparable sales he examined were within a few years, in 1998 and 1999, of the taking in 2002. While we find Mr. Gerdeman's testimony somewhat lacking in that he did not visit and inspect either of the properties at issue or the comparable sales, the trial court found that "Mr. Gerdeman's testimony does substantially assist the trier of fact, even though he hasn't given an exact amount, and he has given the court some ranges on some different types of easements. And the Court will weigh it accordingly...." We do not find that the trial court abused its discretion here, particularly in light of the court's acknowledgment that Mr. Gerdeman's testimony was less than precise. *See e.g.*, *United States v. An Easement and Right of Way over a Tract of Land in Madison County, Tenn.*, 405 F.2d at 307 ("Where witnesses do not based their opinions on sales of the most similar property, their opinions have slight probative value.")(citing *Welch v. Tenn. Valley Auth.*, 108 F.2d 95 (6th Cir. 1939)).

With respect to Mr. Gerdeman's lack of an opinion as to the value of the property rights taken or the impact of the taking on the remainder of the property, the Authority has cited no case law requiring the landowners to put forth expert opinion testimony of value and we have found none. Evidence of value may take many forms; the most common are comparable sales and opinion testimony as to value. In this case, the landowner put forth both forms choosing to present comparable sales evidence through their expert witness while testifying themselves as to their opinion of value. Tennessee has long "followed a policy of liberality in admitting opinion evidence respecting the fair cash market value of real estate" allowing both lay and expert witnesses to give his or her opinion of the fair market value of real estate so long as it is not founded on pure speculation. *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 943 (Tenn. 1977); *see Wray v. Knoxville, L. F. & J. R. Co.*, 113 Tenn. 544, 82 S.W. 471 (1904); *Drainage Dist. No. 4, Madison County v. Askew*, 140 Tenn. 314, 204 S.W. 984 (1918); *Lebanon & Nashville Turnpike Co. v. Creveling*, 159 Tenn. 147, 17 S.W.2d 22, 65 A.L.R. 440 (1929); *Union Joint Stock Land Bank of Louisville v. Knox County*, 20 Tenn.App. 273, 97 S.W.2d 842 (1936); 27 *Am.Jur.2d Eminent Domain* § 581. Mr. Gerdeman's testimony about comparable sales was not made irrelevant merely because he did not also give his opinion of the value of the properties. The fact that Mr. Gerdeman did not inspect the property or give an opinion on the value of the property were issues of weight and credibility of his testimony subject to cross-examination and consideration by the fact finder. Accordingly, we do not find that the trial court abused its discretion in admitting his testimony on the grounds of relevance.

**B. Damages Awarded**

The Authority contends that the weight of the evidence does not support the trial court's award of $3.50 per running foot of the permanent easement. The Authority argues that the trial court incorrectly based its award on the inadmissible testimony of Mr. Gerdeman and the unsubstantiated opinion of the landowners. The Authority further argues that the awarded compensation improperly exceeds the fee simple value of the land burdened by the easement. Finally, the Authority asks this court to reverse the trial court's award and award only nominal damages because, the Authority contends, there was no evidence that the easement substantially damaged the property.

As an initial matter, we need not address the Authority's argument that the trial court relied on inadmissible testimony as we have found the trial court did not abuse its discretion in admitting such. Secondly, we do not find that the landowners' testimony as to the value of the land was "unsubstantiated." In Tennessee, "the owner of real property is held to be qualified, by reason of his ownership alone, to give an opinion in evidence of the value of his land." *State ex rel. Smith v. Livingston Limestone Co., Inc.*, 547 S.W.2d 942, 943 (Tenn. 1977); *Union Joint Stock Land Bank of Louisville v. Knox County*, 20 Tenn.App. 273, 97 S.W.2d 842 (1936); 32 *C.J.S. Evidence* § 546. In addition to their qualification as landowners, both Gene Hooper and Charles Hooper testified that they had several decades worth of personal experience in real estate matters although neither are professional real estate appraisers. Moreover, Charles Hooper testified that his opinion as to the per acre value of the property he owned was informed by his personal experience selling a small six-acre tract around the time of the taking. To the extent the trial court relied on their testimony, we do not believe such reliance was improper given their unique knowledge of the properties by virtue of their ownership and their personal experience in buying and selling real estate in the area.

With respect to the Authority's contention that the trial court's award impermissibly exceeds the fee simple value of the land, we do not find that the record supports such a contention. The Authority contends that "the only expert opinion evidence in the record as to the fee simple value of the appellees' properties is that of [their] expert, Chris Chatham." While this statement is true, Mr. Chatham's opinion is not the only opinion evidence of the fee simple value of the properties in the record. As discussed above, landowners are competent to testify as to their opinion of the value of the land and, in this case, both Gene and Charles Hooper provided an opinion of the value of the respective properties. The trier of fact is "not required to accept or reject in toto the theory of either party, but may arrive at its own concept of truth and justice from the evidence." *State of Tenn. ex. rel. Shaw v. Shofner*, 573 S.W.2d 169, 174 (Tenn. Ct. App. 1978); *see also Union Ry. Co. v. Raine*, 6 Cates 569, 86 S.W.857, 858 (Tenn. 1905) (holding that "when a small strip or portion of the

land is [taken], it ought to be valued at such a price, for the quantity taken, as the jury deemed it would be worth at that place and in that form, whether that be more or less than the price proven per acre for the whole tract"). In this case, the compensation awarded was closer to the value testified to by the landowners, but was certainly within the range of values testified to during the trial.

The Authority next contends that the trial court's award is not supported by the evidence because Mr. Chatham testified that the easement had only a minimal impact on the servient properties. Mr. Chatham testified that he observed no damage or benefit from the easement and that in his opinion neither of the properties suffered a loss of value as a result of the easement. He further testified that when an easement resulted in no discernible loss of value, it was typical to offer a $1.00 per running foot for a similar type subsurface easement in the area near the properties. Mr. Chatham explained that his opinion was based on figures provided by the engineering company for the project, his experience and knowledge of the local market as well as dealings with other utility companies in the area. The Authority also contends that Mr. Chatham's testimony was corroborated by the Authority's design engineer, Ms. Alford.

First, we do not agree with the Authority's characterization of Ms. Alford's testimony. Ms. Alford testified that no permanent structures should be erected over or across the easement, which would be a limitation on the use of the land within the easement that did not exist prior to the taking. In addition to Ms. Alford's testimony, the landowners testified about the limitations to the available uses of the land within the easement on each of the properties after the taking. The trial court acknowledged and made findings of fact based on the above referenced testimony of Ms. Alford and the landowners.

The trial court, however, discredited Mr. Chatham's opinion testimony regarding a $1.00 per running foot award of compensation. The trial court found Mr. Chatham's testimony lacking credibility because it was shown on cross-examination that the report upon which he based his testimony appeared to have been copied, incorrectly so, from other cases as demonstrated by the inclusion of the wrong figures for the length of the easement as well as the incorrect name of the property owners. Mr. Chatham was challenged during cross-examination on the fact that his report appeared to indicate that he routinely opined that $1.00 per running foot was appropriate compensation due landowners as a result of the taking of an easement without due regard for the unique way an easement may cross the land or the unique impact an easement may have on a particular piece of property. During its ruling from the bench, the trial court explained:

> I just don't necessarily find these reports that [Mr. Chatham's] testified to today to be having a lot of credibility, just because of the issue – one thing was

$1 a foot on every piece of property. The Court does believe, as a finding in a ruling, that each property is affected differently by the way the line is laid into that property and how it cuts through the property and there is no way each easement can be a $1 a foot.

We give great deference to the trial court's determinations on matters of witness credibility because the court, which observes the witnesses as they testify, is in the best position to assess witness credibility. *Frazier v. Frazier*, No. W2007-00039-COA-R3-CV, 2007 WL 2416098, *2 (Tenn. Ct. App. Aug. 27, 2007) (citing *Wells v. Tenn. Bd. Of Regents*, 9 S.W.3d 779,783 (Tenn. 1999)). "Accordingly, we will not reevaluate a trial judge's credibility determinations unless they are contradicted by clear and convincing evidence." *Id*. We find no clear and convincing evidence here to reverse the trial court's credibility finding with respect to Mr. Chatham's opinion regarding the impact of the easement on the servient properties. We are, however, troubled by the trial court's subsequent decision to award $3.50 per running foot for both properties without explanation, particularly in light of testimony that the two properties had different per acre market values and the easement taken from the properties affected the two properties differently. While $3.50 per running foot falls within the range of market values testified to during the trial, we cannot find evidence that would support such an award for both properties equally.

The trial court found that the taking resulted in limitations on the landowners' use of the property within the easement and possibly to the remainder of the property, stating, "there was some uses for [the land] but not a whole lot." The trial court did not, however, make any findings as to how the easement affected the property differently despite testimony of such. For example, the record shows that the easement largely followed the property line of the larger property diverging away from the property line for a little over 700 feet to avoid a pond that fell along the property line. By contrast, the record shows that the easement bisected the smaller property essentially cutting off the more valuable part from the remainder. We find that there was sufficient evidence to support the trial court's conclusion that the landowners are entitled to more than nominal damages.

We do not, however, find sufficient evidence to support the trial court's award of $3.50 per running foot. While we agree that an award on a running foot basis is supported by the record, the trial court's award of $3.50 per running foot failed to distinguish between the value of the rights taken and incidental damages. *See Union Ry. Co*, 86 S.W. at 858 (holding that the amount awarded for the value of the land taken and the amount for incidental damages to the remainder of the tract should be reported separately, although a joint judgment for both together may be rendered). Further, there was no evidence, other than Mr. Chatham's discredited testimony, about how and to what extent the limitations on the use of the property affected the value of the land within the easement, a necessary

element in determining the value of the rights taken and there was no evidence of the value of the remainder of the property after the taking, an element necessary in determining incidental damages. Also, as noted above, we cannot find evidence that would support the same per running foot award for both tracts.

Consequently, we find it necessary to vacate the court's award and remand the case for further consideration, which may include the taking of additional proof.

## III. Conclusion

For the foregoing reasons, we vacate the judgment of the trial court and remand the case for further consideration in light of this opinion.

Costs are assessed equally between the parties to this appeal.

_____
RICHARD H. DINKINS, JUDGE